# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

TODD JAGER,

     Plaintiff,

v.                             Civ. No. 18-743 GBW/CG

JOSE G. ANDRADE-BARRAZA, *et al.*,

     Defendants.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTIONS TO STRIKE PLAINTIFF'S EXPERT REPORTS

THIS MATTER is before the Court on Defendants'[1] concurrent motions to strike the expert reports of John R. Reid, M.D. (*doc. 128*) and Farhan Taghizadeh, M.D. (*doc. 130*).  Defendants ask the Court to strike both reports pursuant to Fed. R. Civ. P. 37(c), for their failure to meet the requirements of Fed. R. Civ. P. 26(a).  Having reviewed the parties' briefing (*docs. 134, 135, 140, 142*) and the expert reports (*docs. 125-6, 125-7*), and having heard oral argument from the parties (*doc. 157*), the Court finds that both contested expert reports are deficient in fulfilling the requirements of Rule 26(a).

---

[1] Defendants style themselves "Centurion Defendants" in the titles of these motions.  *See docs. 128, 130.*  In the Third Amended Complaint, Plaintiff uses the term "Centurion Defendants" to refer only to the "six corporate defendants," *doc. 90* at 3 ¶ 16, of which two were later dismissed by stipulation, *doc. 115.*  In their motions to strike, however, Defendants use the term "Centurion Defendants" to describe all remaining defendants, both corporate and individual: Centurion Correctional Healthcare of New Mexico, LLC; MHM Health Professionals, Inc.; Centene Corporation; MHM Services, Inc.; Jose G. Andrade-Barraza, M.D.; Sheri Pierce, R.N.; Lilian Klinger, C.N.P.; and Eduardo Castrejon, M.D.  *See doc. 128* at 1; *doc. 130* at 1.  In other words, the motions to strike are filed on behalf of all remaining defendants.  The Court will therefore refer to them simply as "Defendants."

However, the Court finds that the deficiencies in the reports, except where otherwise noted below, are harmless and do not compel striking of the expert reports or preclusion of the experts' testimony. Defendants' motions to strike will accordingly be denied.

## I. BACKGROUND

Plaintiff filed the currently operative Third Amended Complaint in this action on May 24, 2019. *Doc. 90.* At the time of all relevant events Plaintiff was incarcerated in Doña Ana County, New Mexico, at the Southern New Mexico Correctional Facility ("SNMCF"). *Id*. at 1 ¶ 1, 11 ¶ 69. On May 31, 2016, Plaintiff was punched in the face by a fellow inmate. *Id*. at 11 ¶ 70. He was taken to the SNCMF infirmary and, the following day, was transported to Memorial Medical Center in Las Cruces for x-rays of his facial bones. *Id*. at 12 ¶ 71, 75. On June 3, 2016, SNMCF medical staff received the radiologist's report, which noted "[d]iastases of the frontozygomatic suture"[2] and recommended that a CT scan be performed for further evaluation. *See doc. 133-1 at 4, 26:11–14.* On June 7, 2016, Defendant Klinger requested approval for the recommended CT scan from Defendant Centurion Correctional Healthcare of New Mexico ("CCH").

---

[2] Plaintiff and Defendants apparently disagree about the medical import of the radiologist's report. In his Complaint, Plaintiff alleges that the radiologist "reported that … the bones on Mr. Jager's face had separated." *Doc. 90* at 12 ¶ 77. In their Answer, Defendants deny this allegation. *Doc. 96* at 11 ¶ 77. Moreover, Defendant Klinger stated in her deposition that "there was no fracture seen on the X-ray," *doc. 125-2* at 2, 27:21–22, while both Dr. Reid and Dr. Taghizadeh maintained that the X-ray *did* show a fracture, *doc. 133-1* at 5, 27:9–11 ("That is a fracture."); *doc. 133-4* at 3, 25:6–8 ("Did the radiologist find that there was a fracture…?" "Yes."). In short, this appears to be a factual dispute which the Court need not resolve for purposes of the motions to strike.

*Doc. 90* at 14 ¶ 88. The request was marked "routine" rather than "urgent." *Id.* On June

24, 2016, approximately three weeks after SNMCF staff received the results of the x-ray,

a maxillofacial CT scan was performed on Plaintiff. *Id.* at 14 ¶ 93. It revealed, *inter alia*,

a "quadripod fracture" of the left orbit and "associated severe deformity of the orbit."

*Id.* However, the report noted that the extraocular muscles, optic globe, and optic nerve

appeared intact. *Id.*

The timeline of events following Plaintiff's first CT scan is to some degree

disputed, and the exact details are unimportant for purposes of the instant motions.

However, both parties agree that on September 29, 2016, Plaintiff met for the first time

with surgical specialist Dr. Liat Shama. *Doc. 125* at 5 ¶ 21; *doc. 133* at 10–11. Upon

request by Dr. Shama, Plaintiff received a second CT scan on October 20, 2016, which

confirmed the results of the first. *Doc. 90* at 19 ¶ 122; *doc. 125-4.* Plaintiff met again with

Dr. Shama on December 1, 2016. *Doc. 125* at 6 ¶ 24; *doc. 133* at 11. At that time, options

for repair included refracture of the bones in Plaintiff's face or placement of an implant.

*Doc. 125* at 6 ¶ 24; *doc. 133* at 11. Both options involved substantial risk of

complications. *See doc. 125* at 6 ¶ 27; *doc. 133* at 12. Plaintiff elected against further

treatment because he was concerned about undergoing surgery while still incarcerated

and was due for release in several months. *Doc. 125* at 6 ¶ 28; *doc. 133* at 13.

Plaintiff initiated suit in this Court on August 3, 2018. In his Third Amended

Complaint, Plaintiff alleges that his facial injuries were inadequately treated by SNMCF

medical staff, resulting in, *inter alia*, pain, disfigurement, and loss of chance for a better outcome. *See generally doc. 90.* Following commencement of discovery, Plaintiff disclosed the expert report of Dr. John Reid to Defendants on February 7, 2019. *See doc. 128* at 3–4; *doc. 65.* Plaintiff disclosed Dr. Farhan Taghizadeh's expert report on June 5, 2019, the disclosure deadline for Plaintiff's experts. *See doc. 130* at 4; *doc. 94*; *doc. 75.* Defendants deposed Dr. Taghizadeh on September 13, 2019, *doc. 150*, and Dr. Reid on September 14, 2019, *doc. 149.*

Defendants filed the instant motions to strike on October 15, 2019. *Docs. 128, 130.* Though the arguments differ slightly between the two motions, Defendants' essential contentions are that both expert witnesses (1) failed to fully state the opinions that would be revealed on direct examination, (2) failed to state the bases or reasons for those opinions, (3) failed to specify the facts or data used in forming those opinions, and (4) are not qualified to testify as experts regarding Plaintiff's medical care. *See generally docs. 128, 130.* Plaintiff responded on October 28, 2019, arguing that their experts' reports are adequate under Rule 26(a) and, in the alternative, that any error is harmless because Defendants had the opportunity to fully develop the experts' opinions during their depositions. *See generally docs. 134, 135.* The Court held a hearing on the motions on November 25, 2019. *Doc. 157.* The motions to strike are now before the Court.

## II.   LEGAL STANDARDS

### A. <u>Fed. R. Civ. P. 26(a)(2)</u>

For all witnesses "retained or specially employed to provide expert testimony,"
the Federal Rules of Civil Procedure require a party's Rule 26(a)(1) disclosures to be
accompanied by a written report.  Fed. R. Civ. P. 26(a)(2)(B).  The written report must be
prepared and signed by the witness and must contain the following:

> (i)   a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii)  the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv)  the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v)   a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi)  a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).  The general purpose of these requirements is "to allow the
opposing party 'a reasonable opportunity to prepare for effective cross examination and
perhaps arrange for expert testimony from other witnesses.'"  *Henderson v. Amtrak*, 412
F. App'x 74, 80–81 (10th Cir. 2011) (unpublished) (quoting *Jacobsen v. Deseret Book Co.*,
287 F.3d 936, 953 (10th Cir. 2002)).  In other words, an adequate Rule 26(a)(2) report
should "avoid unfair surprise to the opposing party."  *Heller v. Dist. of Columbia*, 801
F.3d 264, 270 (D.C. Cir. 2015) (quotation and citation omitted).

**B. Fed. R. Civ. P. 37(c)**

Federal Rule of Civil Procedure 37 governs sanctions for failure to make disclosures or cooperate in discovery. Germane to Defendants' motions, the rule states:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>   (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>   (B) may inform the jury of the party's failure; and
>   (C) may impose other appropriate sanctions[.]

Fed. R. Civ. P. 37(c)(1). "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (quoting *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996)). Though a district court need not make "explicit findings" concerning substantial justification or harmlessness, it should consider the following factors in exercising its broad discretion: "1) the prejudice or surprise to the party against whom the testimony is offered; 2) the ability of the party to cure the prejudice; 3) the extent to which introducing such testimony would disrupt the trial; and 4) the moving party's bad faith or willfulness." *Id.* (citing *United States v. $9,041,598.68*, 163 F.3d 238, 252 (5th Cir. 1998) and *Newman v. GHS Osteopathic Inc.*, 60 F.3d 153 (3d Cir. 1995)).

## C. **Fed. R. Evid. 702**

Although Defendants do not explicitly reference Rule 702 or *Daubert* in their original motions to strike,[3] some of the issues raised fall properly within the province of Fed. R. Evid. 702, rather than Fed. R. Civ. P. 26(a). In particular, Defendants allege that the medical expertise of Dr. Reid and Dr. Taghizadeh does not qualify them to testify as experts about the medical care received by Plaintiff in the correctional setting.[4] *See doc. 128* at 10; *doc. 130* at 10. Because the only requirement of Rule 26(a) relating to qualification is the requirement that a witness *disclose* his qualifications—something that neither party disputes Dr. Reid and Dr. Taghizadeh have done, by attaching their respective curricula vitae to their reports—the Court construes Defendants' overall argument regarding qualification as one based on Rule 702. To the extent that Defendants argue the reports simply "[do] not contain enough information to determine whether [they] would qualify," *doc. 142* at 4, that question will be addressed under Rule 26(a).

---

[3] The Court notes that both *Daubert* and Rule 702 are referenced in Defendants' replies. *See doc. 140* at 4, 6; *doc. 142* at 4, 7. Defendants do not assert that their arguments are based on Rule 702, but appear to argue that compliance with Rule 702 is related to compliance with Rule 26(a). *See doc. 140* at 4; *142* at 4.

[4] Some of Defendants' other arguments, such as their assertions that Plaintiff's expert reports are methodologically deficient, also veer into the territory of Rule 702. *See* Fed. R. Evid. 702(c) (expert testimony must be "the product of reliable principles and methods"). However, Defendants base these arguments expressly on Rule 26(a). The Court therefore considers Rule 702 only in this limited instance, and only because no provision of Rule 26(a) is plausibly applicable to the qualification argument. Tellingly, the Court also notes that the cases cited by Defendants in support of their qualification argument were decided based on Rule 702, not Rule 26(a). *See Gayton v. McCoy*, 593 F.3d 610, 618 (7th Cir. 2010); *Estate of Jaquez v. City of New York*, 104 F. Supp. 3d 414, 429 (S.D.N.Y. 2015); *Dukes v. Georgia*, 428 F. Supp. 2d 1298, 1313 (N.D. Ga. 2006).

Federal Rule of Evidence 702 states in relevant part that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" may testify in the form of an opinion. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (citation omitted). "To qualify as an expert, the topic of the proposed expert testimony must 'fall within the reasonable confines of [the witness's] expertise.'" *Siegel v. Blue Giant Equip. Corp.*, __ F. App'x __, 2019 WL 5549331, at *4 (10th Cir. Oct. 28, 2019) (unpublished) (quoting *Conroy v. Vilsack*, 707 F.3d 1163, 1169 (10th Cir. 2013)). In short, an expert witness must possess "such skill, experience, or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 658 (10th Cir. 2018) (unpublished) (quoting *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004)). The burden is on the proponent of the expert testimony to show that the expert is qualified. *Id.* (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001)).

### III. ANALYSIS

**A. <u>Dr. Reid's report is deficient under Rule 26(a), but the deficiency is harmless.</u>**

Defendants argue that Dr. Reid's expert report does not meet the requirements of Rule 26(a) because it does not clearly state or explain the bases of his opinions, and because it does not identify the facts or data considered in forming those opinions. *See doc. 128* at 9–12. For the reasons explained below, the Court finds that Dr. Reid's report is deficient in several respects. However, because the deficiencies are not extreme and because Defendants have already had the opportunity to depose Dr. Reid, the Court finds that the deficiencies are harmless.

*i.    Rule 26(a)(2)(B) Deficiencies*

Defendants do not refer in their motions to requirements (iii)–(vi) of Fed. R. Civ. P. 26(a)(2)(B).[5] Rather, their position is that Plaintiff's expert reports violate Rule 26(a)(2)(B)(i), requiring "a complete statement of all opinions the witness will express and the basis and reasons for them," and (ii), requiring identification of "the facts or data considered by the witness" in forming those opinions.

---

[5] However, in their reply to the motion to strike Dr. Reid's report, Defendants argue for the first time that Dr. Reid's report is "facially deficient" under Rule 26(a)'s requirement that "any exhibits that will be used to summarize or support" the witness's testimony must be attached. *Doc. 142* at 2. This is the first mention of any deficiency with respect to Dr. Reid's attached exhibits or lack thereof. At no point in their motion or reply do Defendants explain which exhibits might be missing, or provide evidence that Dr. Reid intends to use an exhibit at trial that was not included in his Rule 26(a) report. *See generally docs. 128, 140.* Therefore, the Court will not further consider this contention.

There is no precise measurement of the amount of detail required in an expert report by Rule 26(a)(2)(B)(i). Rather, the standard in each individual case is informed by the general aims of Rule 26(a)(2): to allow the opposing party a reasonable opportunity for preparation, *Henderson*, 412 F. App'x at 80–81 (quoting *Jacobsen*, 287 F.3d at 953), and to "avoid unfair surprise," *Heller*, 801 F.3d at 270. For obvious reasons, courts have consistently found that a Rule 26(a) report containing manifestly incomplete analysis or an expressly unformed opinion undermines these goals and violates the rule. *See, e.g., Henderson*, 412 F. App'x at 80 (striking report because, *inter alia*, the witness professedly had not yet completed his analysis); *Jacobsen*, 287 F.3d at 953 (reports noted that the witnesses were, respectively, "in the process of reviewing the remaining materials"; still conducting analysis such that the report was "subject to amendment after additional analysis"; and "expect[ing] to do additional research … and … refine these calculation[s]"); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996) (striking expert report that "included no substantive opinions, but only declared what subjects [the witness] intended to research and discuss at trial"). In addition, although the length of the expert report is not a clear-cut or necessarily determinative factor, courts have considered obviously inadequate length in evaluating whether a report satisfies Rule 26(a). *See, e.g., Sierra Club*, 73 F.3d at 571 (describing reports consisting of "two one-paragraph descriptions of his opinions" and "only one-paragraph statements relating to their opinions"); *Sharpe v. United States*, 230

F.R.D. 452, 455 (E.D. Va. 2005) (one report was only five sentences). Finally, reports that are vague or conclusory do not meet the Rule 26(a)(2)(B)(i) requirement. As the Tenth Circuit explained in another context, "[t]he term 'conclusory' refers to the expression of 'a factual inference without stating the underlying facts on which the inference is based.'" *Kellum v. Mares*, 657 F. App'x 763, 770 (10th Cir. 2016) (unpublished) (quoting Black's Law Dictionary (10th ed. 2014)). It is therefore axiomatic that a conclusory opinion would violate Rule 26(a)(2)(B)(i) by failing to provide its "basis and reasons." *See*, *e.g.*, *Henderson*, 412 F. App'x at 80 (expert report about railroad crossing safety did not "indicate what those widths ideally should be or how the actual widths are dangerous"); *Sharpe*, 230 F.R.D. at 456 (noting the "lack of any reference to the necessary standard of care").

The expert report provided by Dr. Reid is not so manifestly deficient as the examples listed in the cases above. In the main, his conclusions and the bases therefor are fairly apparent on the face of his report. According to Dr. Reid, the standard of care for Plaintiff's injuries at the time of presentation was "pain management, facial CT scan and referral to ENT and Ophthalmology surgical consultants." *Doc. 134-3* at 1. In arriving at this opinion about the relevant standard of care, Dr. Reid explicitly considered Plaintiff's symptoms of "left facial numbness and pain … bilateral periorbital bruising, left facial swelling and indentation of his left cheek." *Id*. Dr. Reid likewise gave his opinions about the standard of care after Plaintiff's facial x-rays on

June 1, 2016, and after the June 24, 2016 CT scan.  Again Dr. Reid considered Plaintiff's symptoms and radiological findings in some detail.  *See id*. (describing x-ray and CT findings).  Dr. Reid described the kind of treatment that would, in his opinion, have been appropriate: pain management, a facial CT scan, and referral to ENT and Ophthalmology surgical consultants at the time of presentation; and immediate referral to a surgical specialist following the June 24, 2016 CT scan, at which point it was "obvious" that Mr. Jager would need surgery.  *Id*.  Therefore, the Court finds that Dr. Reid's report contains several substantive opinions and some explanation for those opinions, and is not wholly conclusory.  Moreover, unlike the reports in *Jacobsen* and *Henderson*, nothing in Dr. Reid's report indicates that his analysis is incomplete or ongoing.

Although Defendants are correct in stating that Dr. Reid did not "consult with authoritative literature" or give a "summary of the principles or methods applied," *doc. 128* at 10, there can be no genuine doubt that Dr. Reid's opinions about the relevant standard of care are based on his education, training, and experience as an emergency room physician.  "In the absence of an alternative [] convention pertinent to the case, it may be assumed that [expert witnesses] base their calculations and opinions on the normal general standards of their profession[.]"  *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006) (declining to strike an expert's report "because he did not expressly use the magic words 'based on generally accepted accounting principles'").

This Court finds the Sixth Circuit's reasoning persuasive, and does not find Dr. Reid's report insufficient on the sole basis that he did not use the magic words "based on my education, training, and experience." The curriculum vitae attached to the report demonstrates that Dr. Reid has practiced in emergency medicine for over twenty years, and is currently the Emergency Medical Director of the Carondelet Holy Cross Hospital in Nogales, Arizona. *See doc. 125-8* at 3–4. In short, Dr. Reid's report clearly "identifies [his] relevant experience." *See Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.*, 315 F. Supp. 3d 101, 114–15 (D.D.C. 2018) (citing *Heller*, 801 F.3d at 271).

In a more complicated case, more foundational explanation might be required. For instance, Defendants suggested during oral argument that Dr. Reid's report could have included a recitation of the number of facial fractures treated in his career. *Doc. 157* at 4. Without a doubt, such an inclusion would have strengthened Dr. Reid's report. However, it is well within the scope of an emergency doctor's role to determine what treatment is needed at the time of an initial trauma, regardless of how many similar cases he has seen or treated. Therefore, the Court finds that Dr. Reid's education, training, and experience are sufficient bases for his opinions about the standard of care for *emergency* treatment of Plaintiff's injuries under Rule 26(a).

The Court nevertheless has several concerns about the adequacy of Dr. Reid's report. Although length is not necessarily a determinative factor, the report comprises just one page of analysis, and some of the opinions it contains are not very thoroughly

explained. For example, although Dr. Reid opines that the standard of care for Mr. Jager's facial injuries was to order a CT scan rather than an x-ray, he does not explain why an x-ray was insufficient. Nor does he explain why Mr. Jager should have been transferred to an Emergency Department rather than to the radiology department of the same hospital. In short, although Dr. Reid's opinions are essentially clear, discerning their bases requires a level of inference not contemplated by Rule 26(a)(2)(B)(i). The purpose of Rule 26 expert reports is "to set forth the substance of the direct examination." *Jacobsen*, 287 F.3d at 953 (quoting Fed. R. Civ. P. 26(a)(2) Advisory Committee Note to 1993 amendment). The Court finds that Dr. Reid's report contains several obvious gaps in substance that would ordinarily be covered during direct examination.

In addition, although Dr. Reid's general experience as an emergency room physician is sufficient to support his opinions regarding emergency care, it is inadequate to support his opinions regarding treatment beyond the immediate aftermath of Mr. Jager's injury. Indeed, counsel for Plaintiff has made it clear that she does not intend to elicit such testimony from Dr. Reid. *See doc. 157* at 1–2. Rather, Dr. Reid was retained "to give his opinion regarding the standards of care Plaintiff should have received shortly following his injury." *Doc. 134* at 1. The Court therefore finds

that the fourth paragraph of Dr. Reid's report, with the exception of the first sentence,[6] does not express any clearly supported opinions and is severely deficient under Rule 26(a)(2)(B)(i).

The Court likewise finds Dr. Reid's report deficient under Rule 26(a)(2)(B)(ii), which requires expert witnesses to provide "the facts or data considered" in forming their opinions. Dr. Reid's report states that he "reviewed meticulously and in great detail the medical records for Todd Jager which were forwarded to me." *Doc. 134-3* at 1. However, it does not specifically identify any of the files or documents reviewed. Given the detailed references to events, dates, documents, and findings from Plaintiff's medical records, this omission might be pardonable if Dr. Reid had in fact reviewed and relied on *all* of Plaintiff's medical records. However, Dr. Reid indicated during his deposition that he did not consider records that preceded the date of Plaintiff's injury, records that were not germane to the case, or records that were duplicates. *Doc. 149* at 3–4, 9:15–l0:2. While Dr. Reid's decision to discard duplicate copies appears inconsequential, and the records preceding Plaintiff's injury are at least easily identifiable, his omission of records "not germane to this issue" is more problematic. It is not immediately apparent which records Dr. Reid may or may not have considered

---

[6] The first sentence of the fourth paragraph reads: "So twenty five days after the injury it is now obvious to anyone that Mr. Jager will need surgery." *Doc. 134-3* at 1. This opinion relates to June 24, 2016, the day of the first CT scan, when the full extent of Plaintiff's injuries first became clear. Therefore, the Court finds that Dr. Reid's training and experience in emergency medicine is a sufficiently self-explanatory basis for the opinion expressed.

germane to Plaintiff's case.  Moreover, these omissions were not disclosed at all in Dr.

Reid's Rule 26(a) report.  Therefore, the report falls short of the applicable standard.

ii.    _Rule 37(c) Harmlessness_

The inquiry does not end, however, with a determination of Rule 26(a)

deficiency.  Rule 37(c) states that expert reports and testimony need not be excluded for

failure to comply with Rule 26(a) if "the failure was substantially justified or is

harmless."  While neither party has argued that substantial justification applies here,

Plaintiff contends that any insufficiency of the reports was harmless.  _See doc. 134_ at 5;

_doc. 135_ at 6.  The Court must therefore consider (1) the prejudice to Defendants, (2)

Defendants' ability to cure the prejudice, (3) the extent to which introducing the

testimony would disrupt the trial, and (4) Plaintiff's bad faith or willfulness.

_Woodworker's Supply_, 170 F.3d at 993.

In this case, the Court finds the first factor to be the most important.  Prejudice

may be avoided where the opposing party "know[s] the substance of the experts'

testimony."  _Jacobsen_, 287 F.3d at 944.  _See also Heller_, 801 F.3d at 271 (any Rule 26(a)

error was harmless where plaintiff "had the opportunity to probe the bases for the

witnesses' opinions when he deposed them").  Defendants have already had an

opportunity to depose Dr. Reid, _see doc. 149_, and indeed elected to do so before

objecting to his report.  Dr. Reid provided greater detail about his opinions, and the

bases for those opinions, in response to Defendants' questioning.  For example, he

explained that a plain x-ray was inadequate in Mr. Jager's case because the level of detail was insufficient for the injury. *See doc. 149* at 8, 27:22–25. He also clearly explained why, in his opinion, transport to the emergency room rather than the radiology department was the standard of care at the time of injury. *See id*. at 8–9 29:2– 30:11. Defendants' actual knowledge of the substance of Dr. Reid's testimony based on his report and deposition, combined with the limited nature of his proffered opinions, obviates any prejudice caused by the mildly deficient report.

In addition, the Court finds that Dr. Reid's deposition mitigated the prejudice caused by his violation of Rule 26(a)(2)(B)(ii). Dr. Reid brought with him to the deposition a stack of the exact records relied upon, which were delivered to defense counsel the evening prior. *See doc. 157* at 2. As in his report, Dr. Reid also referenced specific dates, events, and documents, leaving Defendants in no doubt about the sources of his opinions. Moreover, the Court will require that any evidence or testimony from Dr. Reid by Plaintiff closely hew to the opinions (and bases for those opinions) detailed in the report or explained at his deposition.

With that limitation and under the remaining circumstances, the Court finds that little prejudice or surprise to Defendants will result from the inclusion of Dr. Reid's opinions and testimony, both at trial and for the purpose of any dispositive motions. The Court does not discount the prejudice to defense counsel *during* the deposition caused by Dr. Reid's deficient report. However, that prejudice has been adequately

cured, and the Court sees no persuasive reason to strike Dr. Reid's report and testimony going forward. The only exception to this finding is the fourth paragraph of his report (excluding the first sentence, *see supra* note 6), which the Court hereby strikes for its lack of basis.

On the second factor, whether Defendants "could somehow cure the potential prejudice," *Jacobsen*, 287 F.3d at 953, the Court finds in the affirmative. As described above, the Defendants not only could, but already have, cured much of the potential prejudice by deposing Dr. Reid. Despite Defendants' assertion that the deficient report rendered deposition "impossible," *doc. 140* at 6, it appears from the deposition transcript that defense counsel ably and successfully confronted Dr. Reid on every relevant subject mentioned in their motion, with the exception of the aforementioned fourth paragraph opinions. In addition, Defendants' decision to depose Dr. Reid was not their only option for curing the prejudice of his deficient report. Although Defendants have provided a number of reasons for both the delay in deposing Plaintiff's experts and the decision to do so, *see doc. 157* at 3, 7, the fact remains that Dr. Reid's report was provided to Defendants on February 7, 2019, several months prior to the June 5, 2019 deadline for Plaintiff to disclose his expert reports. Had Defendants communicated their concerns at that time, any and all prejudice might have been cured by the simple expedient of Plaintiff's procuring a new, complete expert report. Therefore, the Court finds that the second factor weighs against striking the report.

The third factor for the Court's consideration is the extent to which introducing Dr. Reid's testimony will disrupt the trial. Because trial is not scheduled for several months in this case, and—even more importantly—because the prejudice to Defendants has already been adequately cured, the Court does not find that any disruption will result from the inclusion of Dr. Reid's report and testimony.

Finally, as to the fourth factor, the Court finds no indication whatsoever that Plaintiff has acted in bad faith, nor do Defendants make such an assertion.

For these reasons, having carefully weighed the Rule 26 harmlessness factors, the Court finds that Dr. Reid's failure to comply with Rule 26(a) was harmless, and declines to exclude his report with the exception of the fourth paragraph as noted above.

**B.** **The Rule 26(a) inadequacies of Dr. Taghizadeh's report are also harmless.**

Defendants apply many of the same arguments in support of excluding Dr. Taghizadeh's report. They assert that he failed to explain the reasoning or methodology behind his opinions, and that he failed to provide a factual background or cite to the specific records on which he based his opinions. *See doc. 130* at 10–11. As with Dr. Reid's report, the Court finds that Dr. Taghizadeh's Rule 26(a) report is deficient, but that its deficiencies are harmless for the reasons described below.

i.    *Rule 26(a)(2)(B) Deficiencies*

At the outset, the Court notes that its concerns regarding Dr. Taghizadeh's report are more significant than those pertaining to Dr. Reid's. This difference stems largely

from the more complex nature of Dr. Taghizadeh's opinions, demanding in turn a more careful and comprehensive explanation of their bases in order to reasonably apprise Defendants of the substance of his testimony.

Dr. Taghizadeh's report falls short of the standard imposed by Rule 26(a)(2)(B)(i) by failing to adequately explain the bases for his conclusions. Dr. Taghizadeh opined, *inter alia*, on the standard of care immediately following Plaintiff's injury; the possible consequences of the delay in discovering Plaintiff's fractures and the delay in repairing them; the timespan within which a surgeon would generally reset the orbital bones; and the possible consequences of non-treatment to Plaintiff's vision. *See doc. 135-3* at 3. As with Dr. Reid's report, the Court accepts Plaintiff's argument that Dr. Taghizadeh's opinions are based in part on his education, training, and experience as a facial plastic surgeon and otolaryngologist. However, Dr. Taghizadeh's opinions are both more complicated and less well-explained than Dr. Reid's. For instance, Dr. Taghizadeh opined that a doctor would *normally* want to perform surgery within a week of the fracture; that allowing a fracture to heal in the incorrect position *may* make the recovery process more painful; and that an untreated fractured orbital bone *can* cause the fat to change, which *can* cause vertical dystopia. *Id*. He did not explain under what circumstances a doctor would not want to perform surgery within one week, under what circumstances an incorrectly healed fracture would or would not make recovery more painful, or what factors might or might not cause fat change and vision difficulties

20

after an untreated orbital fracture. He also completely failed to translate these general opinions into opinions focused on Plaintiff's case. In the Court's view, these more complex opinions about outcome and probability demand more explanation than does an opinion, by an emergency physician, about the standard of care at the time of an acute injury. Rule 26(a) reports need not contain every detail of an expert witness's testimony, but they must contain more than an "outline" of the anticipated testimony. *See Sierra Club*, 73 F.3d at 571 (1.5 page outline listing "points of testimony" found inadequate under Rule 26(a)). Dr. Taghizadeh's report, by virtue of its lack of detail and substantiation, is dangerously close to constituting an outline rather than a complete statement of his opinions.

As for Dr. Taghizadeh's first opinion—that it was "standard of care to provide imaging and medical care" for Mr. Jager's injury—the Court finds that this statement not only lacks foundation but also constitutes a fatally incomplete statement of Dr. Taghizadeh's opinion about the standard of care. The report does not specify what type of imaging would have been appropriate, and the opinion that Mr. Jager should have received "medical care" is outright question-begging. Particularly given Plaintiff's indication that he will not elicit testimony related to emergency care from Dr. Taghizadeh, *see doc. 157* at 5, the Court has no hesitation in striking this portion of Dr. Taghizadeh's report without further analysis.

On the other hand, the failure to *address* certain subjects must be distinguished from the failure to address all subjects *to be discussed during direct examination*. The former, while certainly important for purposes of dispositive motions and trial testimony, does not entail Rule 26(a) deficiency; Rule 26(a) deals only with the latter. Defendants identify several facts that they believe Dr. Taghizadeh should have considered, but that he did not mention in his report. *See doc. 130* at 11; *doc. 140* at 4. Specifically, Dr. Taghizadeh's report does not discuss Plaintiff's June 1, 2016 x-ray, or whether or not Plaintiff complained of any vision impairment.[7] Dr. Taghizadeh's report discusses the possible effects on vision of an injury like Plaintiff's, but does not state that Plaintiff, specifically, has experienced such visual changes as a result of the injury. *See doc. 135-3* at 3. During his deposition, Dr. Taghizadeh explained that he had not personally examined Plaintiff, *doc. 150* at 9, 30:10, but stated that he believed there was "an ophthalmology assessment somewhere in there that validates some of this [opinion]." *Id.* at 10, 36:9–10. While this equivocality may well weaken Dr. Taghizadeh's testimony on the causation issue, it does not indicate that Dr. Taghizadeh intends to offer opinions during direct examination that were not contained in his

---

[7] Even more specifically, Defendants believe that Dr. Taghizadeh should have discussed the facts that "the initial x-ray of June 1, 2016 indicated there were no f[r]actures" and that "Plaintiff never exhibited any signs of visual impairment." *Doc. 130* at 11. In fact it would be surprising if Dr. Taghizadeh referenced either of these facts, given that both are evidently disputed. *See* note 2, *supra* (disagreement over whether the x-ray indicated fractures); *doc. 133-2* at 6, 73:2–5 (Plaintiff's deposition testimony about his depth perception and peripheral vision changes); *doc. 133-3* at 12 (SNMCF Progress Note recording Plaintiff's "sluggish" pupil constriction and occasional "white spot" in field of vision).

report.  Indeed, it rather confirms that Dr. Taghizadeh's expert opinion relates to the kind of visual effects one might typically expect from an injury like Plaintiff's, as opposed to the visual effects actually experienced by Plaintiff.  Therefore, the report in that respect contains a complete, albeit perhaps rather unsatisfactory, statement of Dr. Taghizadeh's opinions about consequent vision problems.  Likewise, although discussion of Plaintiff's x-ray results would undoubtedly have strengthened Dr. Taghizadeh's report, the exclusion of that subject from his report does not in itself violate Rule 26(a), though it may foreclose discussion of the x-ray results on direct examination.

As for Defendants' contention that Dr. Taghizadeh's report violates Rule 26(a)(2)(B)(ii), the Court is unconvinced.  The report contains a section titled "Records Reviewed," which identifies the reviewed files by title, file name, and number of pages. *Doc. 135-3* at 2.  The report additionally references specific dates and events from the reviewed records, making Dr. Taghizadeh's sources easily identifiable.  *See id.* at 2–3. Rule 26(a) reports need not "identify the facts or data they considered in … granular detail." *Bazarian*, 315 F. Supp. at 115.  Indeed, Defendants point to no case law, precedential or otherwise, to suggest that Rule 26(a)(2)(B)(ii) requires specific citations to page numbers in the records reviewed.  Rather, the intent behind the "facts and data" language is "broadly to require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients."  Fed. R. Civ. P. 26 Advisory

Committee Note to 2010 amendment. There is no question that Plaintiff's medical records starting from the time of the altercation have been disclosed to Defendants. Indeed, to the best of this Court's knowledge, Defendants were the ones who originally disclosed those records to Plaintiff. Therefore, the Court does not find that the absence of reference to specific page numbers is fatal to Dr. Taghizadeh's expert report, which satisfactorily identified the facts and data from which his opinions were formed.

*ii.*     *Rule 37(c) Harmlessness*

For essentially the same reasons as Dr. Reid's report, *see* Section III(A)(ii), *supra*, the Court finds that the deficiencies in Dr. Taghizadeh's report are harmless under Rule 37(c). The district court has "broad discretion" to determine harmlessness, though it may abuse that discretion by basing its decision "on an erroneous conclusion of law," or if its decision would result in "fundamental unfairness in the trial of the case." *Jacobsen*, 287 F.3d at 953 (citations omitted).

Considering, once again, the first factor set out in *Woodworker's Supply*, 170 F.3d at 993, the Court finds that no future prejudice to Defendants will result from the inclusion of Dr. Taghizadeh's report. Because Defendants have already reaped the benefit of Dr. Taghizadeh's deposition testimony, which added further detail to his opinions, and because the Court will strictly limit Dr. Taghizadeh's trial testimony to the opinions expressed in his report, the Court finds that the inadequacy of Dr. Taghizadeh's expert report is harmless and will result in no fundamental unfairness to

Defendants. Admittedly, Dr. Taghizadeh's deposition testimony was somewhat less elucidating than Dr. Reid's, and the Court considered additional remedies for his Rule 26(a) deficiencies as a result. In *Jacobsen*, the Tenth Circuit noted that the trial court on remand would have the discretion to allow refiling of complete reports by the expert witnesses. 287 F.3d at 954. Defendants were offered this exact remedy during the parties' oral argument, as well as a second deposition of Dr. Taghizadeh at Plaintiff's expense, but instead selected the option of strictly limiting Dr. Taghizadeh's testimony to the opinions expressed in his report. *See doc. 157* at 7. The Court therefore finds that Defendants have made their choice of remedy and will not be prejudiced despite the absence of an updated, complete report.

As for the second factor, the Court remarks that Defendants had less opportunity here to remedy the prejudice than in the case of Dr. Reid's report, because Dr. Taghizadeh's report was not filed until the Plaintiff's expert deadline of June 5, 2019. All the same, Defendants chose to wait until September 13, 2019 to depose him rather than immediately filing a motion to strike, which could have resolved the matter many months prior to the trial date. In addition, Defendants have successfully cured some portion of the potential prejudice by deposing Dr. Taghizadeh and hearing a more thorough explanation of the opinions expressed in his report. The Court therefore finds that Defendants had some ability to cure their own prejudice, and that any further

potential prejudice caused by the deficient report will be rendered harmless by the strict limitation of Dr. Taghizadeh's testimony.

Third, the Court does not find that introducing Dr. Taghizadeh's testimony will disrupt the trial. We are not "on the eve of trial," *Jacobsen*, 287 F.3d at 954, and in any case, as explained above, the prejudice to Defendants caused by the deficient report has already been cured. The Court therefore anticipates no significant disruption.

Finally, as with Dr. Reid's report, there is neither evidence nor argument to support a finding of bad faith or willfulness on Plaintiff's part.

For these reasons, the Court finds that inclusion of Dr. Taghizadeh's report and testimony is harmless,[8] so long as both are strictly limited to opinions adequately expressed and supported in the report itself or in the deposition testimony. This limitation will be rigorously applied.

### C. Both Dr. Reid and Dr. Taghizadeh are qualified under Rule 702 to testify as experts in this case.

---

[8] Rule 37(c) also provides that the Court may impose "other appropriate sanctions," besides exclusion of the information on motion or at trial, "[i]n addition to or instead of this sanction." Fed. R. Civ. P. 37(c)(1)(C). This language could be taken to mean that, even in the absence of a harmlessness or substantial justification finding, the district court has the discretion to impose less severe sanctions than exclusion. Indeed, at least one district has found that the "exclusionary sanction is mandatory unless the failure to disclose was substantially justified or harmless *or unless the Court finds some other sanctions to be more appropriate.*" *Carroll v. Allstate Fire & Cas. Ins. Co.*, 2014 WL 859238, at *5 (D. Colo. March 4, 2014) (unpublished) (quotation and citation omitted) (emphasis added). *See also Asher v. Colgate-Palmolive Co.*, 278 F.R.D. 608 (D. Colo. 2011) (quoting *Sender v. Mann*, 225 F.R.D. 645, 655 (D. Colo. 2004)) ("While Rule 37(c)(1) is written in mandatory terms with respect to findings supporting the exclusionary aspects concerning withheld discovery, it also vests the court with discretion to impose 'other appropriate sanctions' in addition to, or in lieu of, an order striking witnesses for evidence not properly disclosed."). Because the Court finds here that the deficiencies in Plaintiff's expert reports are harmless, it need not reach the question.

Because Defendants did not style their motions to strike as motions under Rule 702, or make any citations to Rule 702 in their original motions, the Court confines its Rule 702 analysis to the discrete issue raised by Defendants[9]: whether Dr. Reid and Dr. Taghizadeh are qualified to testify as expert witnesses despite their lack of specialization in "correctional medicine." *See doc. 128* at 10; *doc. 130* at 12.

Defendants argue that "correctional medicine" is a "recognized medical specialty in which an experienced provider can be qualified as an expert." *Doc. 128* at 10. Therefore, they contend, merely having a medical degree is insufficient to establish expertise in this specialized field. *See id*. Because Dr. Reid and Dr. Taghizadeh do not specialize in "correctional medicine"—although both have experience in treating inmates—they cannot qualify as experts with respect to the treatment of Plaintiff's injuries.

As Plaintiff correctly notes, however, the case law cited by Defendants does not support this position. It is true that, in *Gayton*, the Seventh Circuit identified a physician witness as an undisputed "expert in the area of prison healthcare." 593 F.3d at 618. However, the *Gayton* court also emphasized that expert qualification is not categorical: rather, the trial court should look at the witness's conclusions individually

---

[9] *See Mascenti v. Becker*, 237 F.3d 1223, 1233 (10th Cir. 2001) (citing *Goebel v. Denver & Rio Grande W.R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000)) (district court is not required to conduct a *sua sponte Daubert* analysis; the court's gatekeeping obligation is "premised on a party's objection"). If Defendants wish to make further arguments under Rule 702 at a later time, they may do so.

to determine whether the witness "has the adequate education, skill, and training to reach them." *Id*. at 617. For example, the same court found that the physician witness was qualified to testify about the patient's cardiac-related cause of death because, although the physician was not a cardiologist, his opinion was "knowledge that any competent physician would typically possess." *Id*. at 618. As for the district court cases cited by Defendants, *see supra* note 3, none establishes that a physician practicing in an ordinary setting is unqualified to opine about medical treatment, relating to his specialty, in the correctional setting. Nor do the cited cases establish that Dr. Reid and Dr. Taghizadeh were required to give "an explanation of how treatment is provided at a prison clinic," *doc. 142* at 4. Expert reports need not completely address every aspect of a case. On the contrary, they need—and should—address only those subjects upon which the witness can offer an expert opinion.

In short, the Court finds that the usual rule applies here: to qualify as an expert, a witness must possess "such skill, experience, or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *Rodgers*, 759 F. App'x at 658 (quoting *LifeWise*, 374 F.3d at 918). Dr. Reid is an emergency medicine specialist, and Dr. Taghizadeh is an otolaryngologist and facial plastic surgeon. Both of these fields are obviously related to Plaintiff's injuries. There is no question that their opinions about Plaintiff's injuries would "fall within the reasonable confines of [their] expertise."

*Siegel*, 2019 WL 5549331, at *4 (quoting *Conroy*, 707 F.3d at 1169).  Based on their respective fields of expertise, it appears that both Dr. Reid and Dr. Taghizadeh would "tend to aid the trier of fact in his search for truth."  Therefore, the Court finds that both are qualified as expert witnesses to opine about Plaintiff's injuries and treatment.

Finally, to the extent that Defendants have argued under Rule 26(a) that the reports do not "contain enough information to determine whether [they] would qualify" as experts, *doc. 142* at 4, the Court rejects the argument.  For all of the reasons discussed elsewhere in this opinion, the general qualifications of Dr. Reid and Dr. Taghizadeh relevant to Plaintiff's case are sufficiently obvious to require little analysis. The Court finds no deficiency in the establishment of the witnesses' qualifications.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions to strike the expert reports of Dr. Reid and Dr. Taghizadeh (*docs. 128, 130*) are hereby DENIED, with the following exceptions:

(1) The fourth paragraph of Dr. Reid's report, from the second sentence onward, is hereby STRICKEN.  Dr. Reid's opinions and testimony will be strictly limited to the time period between May 31, 2016 (the date of Plaintiff's initial injury) and June 24, 2016 (the date of Plaintiff's first CT scan).

(2) The first opinion expressed in Dr. Taghizadeh's report is hereby STRICKEN. Dr. Taghizadeh will not render any opinions relating to the emergency care of Plaintiff's injuries.

It is further ORDERED that both the expert reports in question and any future testimony by Dr. Reid and Dr. Taghizadeh will be limited to the opinions contained in and fairly supported by the reports, and the related opinions disclosed during their depositions.

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**