**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

TODD JAGER,

     Plaintiff,

v.                                     Civ. No. 18-743 GBW/CG

JOSE G. ANDRADE-BARRAZA, *et al.*,

     Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I AND II

THIS MATTER comes before the Court on Defendants' Motion for Partial Summary Judgment to Dismiss Count I (Deprivation of Civil Rights) and Count II (Custom and Practice of Violating Civil Rights) of Plaintiff's Third Amended Complaint. *Doc. 126*. Having reviewed the motion, exhibits, and attendant briefing (*docs. 133, 136*), and presided over oral argument in this matter (*doc. 184*), the Court will GRANT partial summary judgment in favor of Defendants for the reasons explained below.

### I. PROCEDURAL HISTORY

Plaintiff initiated this suit in federal court on August 3, 2018. *See doc. 1.* His claims arise from an incident during his incarceration at the Southern New Mexico Correctional Facility ("SNMCF") in which he was punched by another inmate and allegedly received substandard care for his facial injuries. Plaintiff filed his currently

operative Third Amended Complaint ("TAC") on May 24, 2019, asserting the following claims relevant to the instant motion: (I) failure to provide reasonable and timely medical treatment in violation of the Eighth Amendment, against all Defendants, and (II) custom and policy of violating civil rights by the corporate Defendants, Defendant Pierce, and Defendant Andrade. *Doc. 90* at 21–23.

Defendants' present motion for partial summary judgment was filed on October 14, 2019.[1] *Doc. 126.* One day later, Defendants filed motions to strike the reports of Plaintiff's expert witnesses, Dr. John R. Reid, M.D., and Dr. Farhan Taghizadeh, M.D. *See docs. 128, 130.* On December 18, 2019, the Court denied Defendants' motions to strike the reports, but remarked several Rule 26(a) deficiencies and strictly limited both experts' testimony to the opinions expressed in their reports and depositions. *See doc. 171.* Consequently, for purposes of Defendants' summary judgment motions, only those opinions will be considered.

In the present motion, Defendants argue entitlement to summary judgment on the ground that Plaintiff cannot establish either the objective or the subjective component of the deliberate indifference standard. In particular, they contend that Plaintiff was provided with timely and adequate treatment; that his injury was cosmetic and any surgery to repair it was not medically necessary; and that Defendants did not have the culpable state of mind to satisfy the subjective component. *See generally doc.*

---

[1] Defendants contemporaneously filed two other partial summary judgment motions. *See docs. 125, 129.*

*126.*  Plaintiff argues that his medical need, and the risk of harm consequent upon delay, were obvious; that Defendants knew timely treatment of his facial fractures was essential; and that the proper treatment, surgery, was not offered until many months after the initial injury, after his fractures had healed in an incorrect position.  *See generally doc. 133.*  The motion is now before the Court.

## II.  UNDISPUTED MATERIAL FACTS

Based on the parties' briefing and the record as a whole, the Court finds the following material facts to be undisputed for purposes of Defendants' motions for summary judgment:[2]

1.  On May 31, 2016, Plaintiff, an inmate at the Southern New Mexico Correctional Facility ("SNMCF"), was punched in the face by another inmate.  SMF 1;[3] *doc. 90* at ¶¶ 69–70.

2.  Plaintiff did not initially report his injury and remained in his cell for several hours.  SMF 2; *doc. 125-1* at 27:24–28:4, 29:12–18.

---

[2] In his response, Plaintiff proposes a number of additions to Defendants' Statement of Material Facts, all of which Defendants dispute on various grounds.  *See doc. 136* at 1–7.  Because disputed facts must, in any case, be viewed in the light most favorable to Plaintiff, *see Penry v. Fed. Home Loan Bank,* 155 F.3d 1257, 1261 (10th Cir. 1998), considering Plaintiff's additional facts as undisputed would have no effect on the Court's analysis.  Where the record reasonably supports Plaintiff's version of events, those additional facts will be taken as true for the purposes of this motion.

[3] The citation "SMF" refers to the Statement of Material Facts contained in Defendants' motion.  *Doc. 126* at 3–7.

3.      At around 10:00 p.m. on the evening of May 31, 2016, Plaintiff was taken by security personnel to the medical unit, where he was medically evaluated.  SMF 3; *doc. 125-1* at 32:18–24.

4.      Plaintiff was examined and did not exhibit nausea, vomiting, headaches, seizure activity, or visual impairment.  SMF 4; *doc. 125-2* at 51:7–12.

5.      On June 1, 2016, Plaintiff was transported to Memorial Medical Center in Las Cruces, New Mexico for x-rays of his facial bones.  SMF 5; *doc. 90* at ¶ 75.

6.      The radiology report indicated the following findings: "Diastases of the frontozygomatic suture.[4]  No fracture of the zygoma is apparent.  Suggests CT scan/facial bone series for further evaluation."  SMF 6; *doc. 133-1* at 26:11–14.

7.      The radiology report from Memorial Medical Center was reviewed by SNMCF medical staff on June 3, 2016.  SMF 7.

8.      Plaintiff recalls receiving multiple medications for pain including Tramadol, Topamax, Ibuprofen, and Naproxen.  SMF 12.  Plaintiff was provided with the pain reliever Tramadol on June 17, 2016.  SMF 11; *doc. 125-1* at 46:23–47:10.

---

[4] Plaintiff and Defendants disagree about whether the x-ray report revealed a fracture.  Both of Plaintiff's expert witnesses testified that the finding of "diastases" connotes a fracture.  *Doc. 133-1* at 27:9–11; *doc. 133-4* at 25:6–8.  Defendant Klinger, however, maintained the opposite.  *Doc. 125-2* at 31:22–25; *see also doc. 136* at 3.  In light of this factual disagreement, the Court cannot consider as an undisputed fact that the x-ray revealed no fractures.

9.      As suggested in the x-ray report of June 3, 2016, Defendant Lillian Klinger

submitted a request for an off-site CT scan on June 7, 2016.  SMF 13; RMF 13; *doc. 125-3*

at 28:4–5.

10.      A CT scan was performed on June 24, 2016.  The CT scan revealed a quadripod

fracture of the left zygoma.  SMF 14; *doc. 125-5* at 111:11–18.

11.      Dr. Andrade met with Plaintiff on July 2, 2016 regarding the CT scan results.

SMF 17; *doc. 125-3* at 63:12–14.

12.      On July 11, 2016, Defendants submitted a consultation request form for Plaintiff

to meet with Dr. Liat Shama.  SMF 18; *doc. 125-3* at 74:24–75:1.

13.      The appointment resulting from the July 11, 2016 request with Dr. Shama was set

for September 29, 2016.  SMF 19; *doc. 125-3* at 78:12–13, 23–24, 79:5–6.

14.      On July 26, 2016, a consultation request was submitted to have Plaintiff seen by

University of New Mexico Ophthalmology.  Plaintiff was given an appointment with an

Ophthalmologist, to occur on October 6, 2016.  SMF 20; *doc. 125-2* at 93:14–16, 92:15–17.

15.      Upon meeting with Plaintiff on September 29, 2016, Dr. Shama requested an

additional CT scan.  She specifically requested a 3D face scan.  SMF 21; *doc. 125-3* at

105:13–18.

16.      The 3D facial CT scan was performed on Plaintiff on October 20, 2016, as

requested by Dr. Shama.  SMF 22; *doc. 125-4*.  The 3D facial CT scan "[r]eidentified left

facial fractures" found in the prior scan.  *Doc. 125-4* at 1.  It revealed the following

specific findings: comminuted fracture of the left lateral orbital wall, fracture of the left orbital floor, fracture of the anterior and posterolateral walls of the maxillary sinus, depression of the left zygoma, and deformity of the left orbit. *Id*. The extraocular muscles and globes were intact. *Id*.

17.     On December 1, 2016, Plaintiff met with Dr. Shama at the University of New Mexico Hospital for a surgical consultation. SMF 23; *doc. 125-6* at 28:15–19.

18.     During the December 1, 2016 meeting, Dr. Shama discussed with Plaintiff possible options for repair, "which would include refracture of the fracture versus [the] possibility [of] an implant." SMF 24; *doc. 125-6* at 28:24–29:11.

19.     Dr. Shama believed that Plaintiff's surgery was for cosmetic purposes and there was no medical reason to provide the surgery. SMF 25; *doc. 125-6* at 30:7–15.

20.     Dr. Shama consulted with two colleagues, an ophthalmologist, Dr. Amar Joshi, and an otolaryngologist, Tara Brennan, M.D. SMF 26; *doc. 125-6* at 22:2–17.

21.     Plaintiff met with Dr. Brennan on March 8, 2017. Mr. Jager was presented with the options of an implant or surgery that would rebreak and reset his facial bones. Mr. Jager was advised that an implant could cause blindness if he were in another altercation. SMF 27; *doc. 125-1* at 80:8–12.

22.     Plaintiff chose not to have surgery, as he was six or seven months from being released from custody. He also did not want to have surgery while incarcerated because, "I've seen it, the cleanliness, the medical with the pills . . . . So, you know, it

scared me to get medical treatment this far already into it, and I'm already going to be getting out already. So, to have that medical rebreak my face, go through this thing in prison, do you know what I mean is—it's more traumatic. And I was worried about my health, essentially, having this going on when I was in prison." SMF 28; *doc. 125-1* at 75:18–76:3; 82:12–19; 83:6–10, 14–18.

23. Plaintiff filled out multiple written Health Service Request forms seeking medical care. SMF 29; *doc. 125-1* at 51:10–12.

24. Plaintiff was released from prison in October 2017. SMF 31; *doc. 125-1* at 56:15–16.

### III. LEGAL STANDARDS

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the movant meets this burden, the non-moving party is required to designate specific facts showing that "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Celotex*, 477 U.S. at 324.

In applying this standard, the court must draw all "reasonable inferences" in the light most favorable to the non-moving party. *Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1261 (10th Cir. 1998) (citation omitted). Summary judgment is appropriate only "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id*. (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## B. Deliberate Indifference

It has long been established that deliberate indifference to the "serious medical needs" of a prisoner violates the Eight Amendment. The court's analysis of a prison official's deliberate indifference "involves both an objective and a subjective component." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). Both must be satisfied in order to state a claim for deliberate indifference.

First, under the objective component, the prisoner must demonstrate that his medical need was "sufficiently serious." *Id*. (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The purpose of this requirement "is to limit claims to significant, as opposed to trivial, suffering." *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005). A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention." *Hunt v. Uphoff*, 199 F.3d 1220, 1224

(10th Cir. 1999) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)). Where the

prisoner's claim is based on a delay in providing medical care, rather than a total failure

to provide care, the prisoner must "show that the delay resulted in substantial harm."

*Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (quotation and citation omitted).

This may include showing that "more timely receipt of medical treatment would have

minimized or prevented the harm." *Kikumura v. Osagie*, 461 F.3d 1269, 1292 (10th Cir.

2006) (citation omitted). Alternatively, the prisoner may satisfy the objective

component by demonstrating significant pain during the delay. *See Mata*, 427 F.3d at

753 ("[T]he prisoner's claim may be based, for example, on intolerable chest pain rather

than the subsequent heart damage."); *Sealock*, 218 F.3d at 1210 (finding the objective

component satisfied based on severe chest pain experienced during the delay, even if

there was no evidence of resulting damage to the plaintiff's heart).

Second, under the subjective component, the prisoner must show that the

defendant "knew he faced a substantial risk of harm and disregarded that risk, 'by

failing to take reasonable measures to abate it.'" *Hunt*, 199 F.3d at 1224 (quoting *Farmer*,

511 U.S. at 847). The requisite *mens rea* is equivalent to criminal recklessness, as the

defendant must actually know of the substantial risk. *Farmer*, 511 U.S. at 837 ("[T]he

official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference.").

Accordingly, "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Perkins v. Kan. Dep't of Corrections*, 165 F.3d 803, 811 (10th Cir. 1999). The defendant's conscious disregard of the prisoner's risk of harm is a question of fact "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. Consequently, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*. For example, "a jury may infer conscious disregard" where a prison doctor "responds to an obvious risk with treatment that is patently unreasonable." *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006). *See also Kikumura*, 461 F.3d at 1294 (a jury could properly infer from plaintiff's extreme pain, nausea, and inability to standard or walk that the defendant knew of and disregarded a significant risk of harm).

The Tenth Circuit recognizes two kinds of deliberate indifference claims. In some instances, a medical provider may fail to properly treat a serious medical condition. *Sealock*, 218 F.3d at 1211. In other cases, a prison official may "prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Id*. (citing *Ramos*, 639 F.2d at 575). A medical professional "[o]rdinarily . . . will not be liable for this second kind of deliberate indifference, because he is the person who provides the treatment." *Id*. However, if a medical professional "knows that his role in a particular medical emergency is solely to

serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference," then he may be liable under a "gatekeeper" theory of deliberate indifference. *Id*.

## IV. ANALYSIS

It is undisputed that Plaintiff received some medical treatment for his injuries, including, ultimately, the opportunity to have his facial bones surgically aligned by a specialist. UMF 21.[5] However, Plaintiff alleges that his treatment was untimely and therefore inadequate. In order to proceed past summary judgment, Plaintiff must show that the delay resulted in "substantial harm," which may include, but is not limited to, significant intermediate pain or a failure to minimize or prevent harm. *Oxendine*, 241 F.3d at 1276; *Sealock*, 218 F.3d at 1210; *Kikumura*, 461 F.3d at 1292. In addition, Plaintiff argues that while Defendants provided some medical treatment throughout Plaintiff's recovery, it was the wrong treatment. Though "federal courts are generally reluctant to second guess medical judgments" where some treatment has been provided, *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)), deliberate indifference may nevertheless be shown where a medical provider "responds to an obvious risk with treatment that is patently unreasonable." *Self*, 439 F.3d at 1232.

---

[5] The citation "UMF" refers to the Undisputed Material Facts contained herein.

Because Plaintiff claims that the individual Defendants were deliberately indifferent to his medical needs at three distinct points in time, the Court analyzes each in turn.

Emergency Treatment

First, at the time of his initial injury on May 31, 2016, Plaintiff contends Defendants were deliberately indifferent in failing to take him to the emergency department for pain relief, CT scans, and a surgical consult, despite the fact that his facial bones were "obviously fractured." *Doc. 133* at 1. Plaintiff has produced evidence, in the form of an expert report and testimony by Dr. Reid, that this course of action was the standard of care for Plaintiff's presenting injuries. *See doc. 125-8* at 1; *doc. 133-1* at 27:19–30:11. Instead, Plaintiff was transported to the radiology department of Memorial Medical Center to receive an x-ray. Dr. Reid further explained in his deposition testimony that the level of detail in a plain x-ray was insufficient to assess Plaintiff's injuries, and that a reasonable doctor would have ordered a CT scan. *Doc. 133-1* at 27:19–28:2. Plaintiff therefore argues that Defendants' actions were deliberately indifferent.

Though Defendants' decisions to transport Plaintiff to the radiology department rather than the emergency department, and to order an x-ray rather than a CT scan, might conceivably constitute medical negligence, this Court is unpersuaded that they represent errors of a constitutional dimension. Plaintiff was not denied medical

treatment at the time of his injury, nor is there evidence of record that emergency treatment was materially delayed.[6] It is undisputed that Defendant Lilian A. Klinger, CNP, examined Plaintiff the following morning. UMF 4. Her examination included an eye exam and a neurological exam. UMF 4; *doc. 125-2* at 4, 51:7–12. Based on her evaluation, she determined that Plaintiff did not need to go to the emergency room because he did not exhibit signs of brain damage or vision problems. *Doc. 125-2* at 4, 51:7–12, 52:6–13. On that same day, in accordance with Defendant Klinger's orders, Plaintiff was transported to Memorial Medical Center's radiology department for an x-ray of his facial bones. UMF 5; *doc. 125-2* at 4, 51:1–6. Therefore, rather than alleging that Defendants denied or delayed emergency medical treatment for his injuries, Plaintiff's contention in this instance is that Defendants provided the incorrect treatment.

The Tenth Circuit has made clear that disagreements over the proper medical treatment do not establish violations of the Eighth Amendment. "[A] prisoner who merely disagrees with a diagnosis or prescribed course of treatment does not state a constitutional violation." *Perkins*, 165 F.3d at 811. In *Perkins* the plaintiff alleged deliberate indifference because prison officials would not provide him with an additional medication for his HIV, which he believed was necessary to prevent

---

[6] Though Plaintiff was not transported to Memorial Medical Center until June 1, 2016, the day after the altercation, Defendants were only made aware of his injuries at 10:00 p.m. on the night of May 31. UMF 3.

immunity to his existing drugs. The court found no constitutional violation. The prison officials had "recognized his serious medical condition and [were] treating it," albeit not in the manner that he preferred. *Id*. Indeed, a medical provider may be even "negligent in diagnosing or treating a medical condition" without committing a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

The Court finds that Defendants' failure to send Plaintiff to the emergency department, and to order a CT scan rather than an x-ray, was at worst negligent. "[W]hether an X-ray—or additional diagnostic techniques or forms of treatment—is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment." *Id.* at 107. The scenario described in *Estelle* is precisely the one before the Court. Defendants made a medical judgment to order an x-ray rather than a CT scan. They made a similar such judgment to transport Plaintiff to the radiology department of the hospital rather than the emergency department. Though Dr. Reid's testimony, viewed in the light most favorable to Plaintiff, demonstrates that this course of action was suboptimal and perhaps even negligent, no evidence of record shows that it violated the Eighth Amendment.

Plaintiff additionally argues that the failure to provide pain medication and a consultation with a facial surgeon at the time of his initial injury constituted deliberate indifference. *See doc. 133* at 15–16. Even according to Dr. Reid's testimony, a CT scan

was necessary to reveal the extent of Plaintiff's facial fractures.  *See doc. 180* at 15, 29:10–

12.  Therefore, the Court cannot find that Defendants were deliberately indifferent for

failing to provide a surgical consult prior to receiving the CT scan results.  As for

Defendants' alleged failure to provide Plaintiff with adequate pain medication, courts

have consistently found that "[t]he failure to provide stronger pain medication does not

constitute deliberate indifference."  *Sherman v. Klenke*, 653 F. App'x 580, 588 (10th Cir.

2016) (unpublished) (internal quotation and citation omitted).  *See also Sherman v. Klenke*,

67 F. Supp. 3d 1210, 1232 (D. Colo. 2014) (collecting cases); *Beauclair v. Roberts*, 2015 WL

541571, at *19 (D. Kan. Feb. 10, 2015) (unpublished) (same).

Of course, there are some cases in which a prison official's failure to address a

prisoner's pain and other symptoms does create a constitutional violation.  *See, e.g.*,

*Sealock*, 218 F.3d at 1208 (plaintiff was told by prison guard that despite his chest pain,

vomiting, and difficulty breathing, nothing could be done until the physician's assistant

arrived in the morning); *Mata*, 427 F.3d at 756 (plaintiff with cardiac symptoms and

severe chest pain was told by the nurse on duty that nothing could be done until the

infirmary opened in the morning).  One could even imagine a situation in which pain

relief, though offered, was so grossly and manifestly inadequate that it rose to the level

of deliberate indifference.

Such a case, however, is not before us.  Defendants actively treated Plaintiff's

injuries from the time that they were made aware of them.  Notably, in both *Sealock* and

*Mata*, guards and medical providers who took *no* ameliorative action were found to be deliberately indifferent, while providers who merely made negligent misdiagnoses, and acted accordingly, were granted summary judgment. *See Mata*, 427 F.3d at 759–61 (nurses who misread plaintiff's EKG as "normal" and incorrectly believed she was not having a heart attack did not act with deliberate indifference); *Sealock*, 218 F.3d at 1211 (summary judgment in favor of physician's assistant was denied not due to his misdiagnosis, but because his own testimony established that the failure to provide emergency treatment for unexplained chest pain would be deliberately indifferent, and his knowledge of plaintiff's chest pain was disputed). Furthermore, the defendants' misdiagnoses in both cases led to inadequate treatment of the plaintiffs' pain and other symptoms. The only pain relief provided in *Mata* was a permission slip to miss prison activities for the day. *Mata*, 427 F.3d at 750. The only pain relief evidently provided for the plaintiff's severe chest pain in *Sealock* was Tylenol, which the plaintiff was unable to keep down due to vomiting. *Sealock*, 218 F.3d at 1208.

Unlike the plaintiffs in *Sealock* and *Mata*, Plaintiff received treatment for his injuries, even if it was not the treatment that he preferred. Plaintiff was examined by Defendant Klinger, transported to Memorial Medical Center, and provided with an x-ray of his facial bones. For purposes of this motion the Court must assume, as Plaintiff asserts—and Defendants do not specifically deny—that Plaintiff was provided with no pain relief apart from an icepack prior to receiving the x-ray results. *See doc. 133* at 7;

*doc. 136* at 4.  But nothing in the record suggests that this decision was motivated by deliberate indifference on the part of Defendants.  Determining what pain relief to give Plaintiff in light of his symptoms was a classic exercise of medical judgment.  *See Sherman*, 653 F. App'x at 588; *Beauclair*, 2015 WL 541571, at *19.  This was particularly true prior to Defendants' receipt of the radiology report, a period during which knowledge of Plaintiff's facial injuries cannot be imputed to Defendants.

Following Defendants' receipt of the x-ray report, the parties disagree about what pain medication was provided to Plaintiff.  *See doc. 133* at 7; *doc. 136* at 4.  Defendants allege as an undisputed fact that Plaintiff was given 600 milligrams of Ibuprofen on June 3, 2016 (the day the x-ray report was reviewed).  *Doc. 126* at 4.  Plaintiff denies this.  The basis of the disagreement can be found in the following exchange from Plaintiff's deposition testimony, regarding his medical records:

> [Defense counsel]: So if you see, you know, Number 2, it says, if I'm correct, 'Ibuprofen, 600 milligrams.'  And below that is—
> [Plaintiff]: Okay.  Now, I've got it.
> Q: —the third.  It looks like 6/3/16.
> A: Okay.
> Q: So would you have any reason to disagree that you got—
> A: That's when they gave it to me?
> Q: 600 milligrams.  That's when the physician ordered it, and the—well, the order at this point is signed by Klinger, I believe.
> A: I think so, I don't know.  I can't read that.

*Doc. 145-1* at 46:3–16.  The Court agrees with Plaintiff that, in the absence of any

documentation of record, Plaintiff's receipt of 600 milligrams of Ibuprofen on June 3,

2016 cannot be considered as an undisputed fact.[7]

However, even viewed in the light most favorable to Plaintiff, the evidence does

not support a finding of deliberate indifference on this basis.  Also absent from the

record is substantial evidence of the severity of Plaintiff's pain during that period, the

extent to which Defendants were aware of his pain level, and any indication that

Defendants knew of, but consciously disregarded, a medical need for additional pain

medication.  "Summary judgment requires more than mere speculation.  It requires

some *evidence*, either direct or circumstantial, that [the defendant] knew about and

consciously disregarded the risk."  *Self*, 439 F.3d at 1235 (citing *Bones v. Honeywell Int'l,

Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)).  In this case, somewhat to the contrary, the

record is replete with evidence that Plaintiff was provided multiple different pain

medications over an extended period of time.  UMF 8.  This is not dispositive of the

treatment provided immediately following Plaintiff's injuries, but it does suggest that

Defendants were not indifferent to Plaintiff's pain.  Based on the treatment that Plaintiff

received in the days following his injuries, the Court declines to second-guess

Defendants' medical judgment in determining what pain relief to provide.  The Court

---

[7] Defendant Klinger also testified that Plaintiff received Tramadol "from the very beginning of June." *Doc. 136-1* at 58:19–25.  For the same reasons, this too cannot be considered as an undisputed fact.

therefore finds no constitutional violation in the emergency treatment of Plaintiff's injuries.

<u>Delay in Ordering CT Scan</u>

The second time period during which Plaintiff asserts Defendants' deliberate indifference is from approximately June 3, 2016, the date the x-ray report was reviewed, through June 24, 2016, the date of Plaintiff's first CT scan. Following Defendants' review of the radiology report, Plaintiff states that he "was not taken to the emergency department for pain management, a CT scan, and a consultation with a facial surgeon," and furthermore "was not given a CT scan for three additional weeks." *Doc. 133* at 16.

That there was a regrettable delay in ordering Plaintiff's recommended CT scan is undisputed. Defendants reviewed the radiology report recommending a CT scan on June 3, 2016; Defendant Klinger submitted the request for an off-site CT scan on June 7, 2016; and Plaintiff did not ultimately receive the follow-up scan until three weeks after it was recommended, on June 24, 2016. UMF 6, 9, 10. Defendant Klinger testified that the "delay was due to not receiving the authorization from MHM," one of the corporate Defendants in this suit. *Doc. 133-3* at 10. Based on his response to a concurrent partial summary judgment motion, Plaintiff appears to agree with this characterization, at least in part. *See doc. 144* at 10 (stating as an undisputed material fact that Defendant Klinger "intentionally misrepresented facts in Mr. Jager's medical record . . . to cover up for MHM/Centene's delay in providing authorization for Plaintiff's necessary offsite

medical care."). This administrative delay, though certainly less than ideal, does not appear to have been brought about by the conscious disregard of any Defendant toward Plaintiff's injuries. The reality of medical care in the correctional setting is that, owing to security and other concerns, such administrative delays may occur. The Supreme Court has explicitly recognized that "society does not expect that prisoners will have unqualified access to health care." *Hudson v. McMillan*, 503 U.S. 1, 9 (1992). While the delay in providing Plaintiff a CT scan may have been negligent, there is no evidence that it was unconstitutional.

Plaintiff argues that Defendants' awareness of his facial fracture, and therefore of the need for further treatment including surgery, can be inferred from the fact that it was obvious. It is well established that the factfinder may make this kind of inference in the Eighth Amendment context. *See Farmer*, 511 U.S. at 842. However, the key distinction is that the need for further treatment must be sufficiently obvious. *See Oxendine*, 241 F.3d at 1279 (subjective deliberate indifference could be inferred from the doctor's knowledge that the plaintiff's finger "had turned jet black" and was "gradually falling off"); *Kikumura*, 461 F.3d at 1294 (jury could infer that defendant knew of and disregarded a "significant risk of harm" where the plaintiff was experiencing extreme pain, nausea, and the inability to stand or walk). *Cf. Self*, 439 F.3d at 1227 (plaintiff's specific condition was not obvious from his symptoms of fever, aches, chills, and pain in his calf); *Mata*, 427 F.3d at 759–61 (no subjective deliberate indifference in defendant's

misdiagnosis of plaintiff's severe chest pain and other symptoms).  In one unpublished disposition, the Tenth Circuit held that conscious disregard may be inferred where the need for treatment is "apparent to a layman or glaringly obvious to a medical professional."  *Heidtke v. Corrections Corp. of America*, 489 F. App'x 275, 283 (10th Cir. 2012) (unpublished).

In this case, there is no evidence that Defendants "respond[ed] to an obvious risk" with treatment that was "patently unreasonable."  *Self*, 439 F.3d at 1232.  Plaintiff states in his response to the motion: "The x-ray report of June 3, 2016 directly told Defendants that Plaintiff had a facial fracture in part of his face and that he may have one in another part of his face that can only be detected by a CT scan."  *Doc. 133* at 16. In support of this assertion, both of Plaintiff's expert witnesses testified that the x-ray report revealed a fracture.  *Doc. 133-1* at 27:9–11; *doc. 133-4* at 25:6–8.  Defendant Klinger, however, testified that the x-ray report did not show a fracture.[8]  *Doc. 125-2* at 27:21–22, 30:2–7, 31:22–25.  Viewing the record as a whole, it appears that Defendants were working under the assumption—correct or not—that the x-ray did not indicate a fracture.  Plaintiff has shown no specific evidence of Defendants' awareness of a

---

[8] Based on the "Statement of Material Facts" section of Defendants' motion, it appears that Defendant Andrade made a similar statement in his deposition testimony.  *Doc. 126* at 4 ("Dr. Andrade . . . did not believe that Plaintiff's injuries constituted an emergency because the radiologist from Memorial Medical Center stated there were no fractures.").  Unfortunately the cited pages (pp. 116 and 121) were not included in Defendants' filing of the cited exhibit.  *See doc. 125-3.*

In addition, although the record is not entirely clear because some pages of the deposition transcript are not included, it appears Defendant Castrejon testified that a "diastases" means bones "may be separated" rather than that they are fractured.  *See doc. 145-5* at 29:1–3.

fracture, nor has he demonstrated that Plaintiff's condition was "glaringly obvious." *See Heidtke*, 489 F. App'x at 283.

Defendant Klinger, Defendant Castrejon, and Dr. Reid each testified that the purpose of a CT scan is to reveal fractures that may not be evident on a plain x-ray. *See doc. 125-2* at 27:15–22; *doc. 145-5* at 31:6–32:1; *doc. 133-1* at 27:21–23. In addition, Defendant Klinger explained in her testimony why it was difficult or impossible to tell whether Plaintiff had a fracture prior to his CT scan, due to swelling and other factors. *Doc. 125-2* at 49:14–50:6. Taking the record as a whole, Plaintiff's facial fractures were not so obvious, either from physical examination or based on the radiologist's report, that Defendants' subjective deliberate indifference can be inferred from their obviousness. Plaintiff points to Defendant Klinger's testimony that as of June 22, 2016, when she performed a physical exam, she "really felt" that Plaintiff had a fracture. *Doc. 145-3* at 42:23–43:9. But given the temporal proximity of this physical exam to the June 24, 2016 CT scan, which was to provide a definitive diagnosis, the Court does not find that Defendant Klinger's decision to take no further action in the remaining two days constituted deliberate indifference.

There is a limit to the favorable inferences that may be made in Plaintiff's favor. Plaintiff has failed to come forward with evidence that Defendants knew he had facial fractures and consciously disregarded the risk of harm that might result therefrom. *See*

*Self*, 439 F.3d at 1235.  Therefore, the Court finds no deliberate indifference during the time period between the x-ray report and the CT scan.

Delay in Obtaining a Surgical Consult

Finally, Plaintiff alleges that Defendants' delay in obtaining a surgical consult for Plaintiff, following the CT scan report, was deliberately indifferent given their knowledge that Plaintiff's bones would heal incorrectly within a several-week timeframe.  *Doc. 133* at 18.  For several reasons, the Court cannot agree.

First, Plaintiff has failed to establish that Defendants' course of action constituted deliberate indifference rather than a difference of opinion about the course of treatment. At the time of receiving Plaintiff's CT scan results, which first alerted them to the extent of his injuries, Defendants argue that reconstructive surgery was cosmetic rather than medically necessary.  *See doc. 126* at 17–19.  That the individual Defendants held this opinion—regardless of its accuracy—is certainly supported by their record testimony. *See*, *e.g.*, *doc. 145-8* at 155:8–21 (Defendant Pierce's testimony that Plaintiff's only symptoms were "cosmetic"); *doc. 145-3* at 91:22–92:1 (Defendant Klinger's testimony that on July 26, 2016, the request for a surgical consult was not marked "urgent" because Plaintiff's injury was considered cosmetic); *doc. 145-7* at 89:23–90:5; 94:13–25 (Defendant Andrade-Barraza's testimony that his concerns with Plaintiff's injuries were "[c]osmetic only").  Importantly, Dr. Liat Shama at the University of New Mexico, the surgical specialist with whom Plaintiff ultimately received his first consultation,

testified that the proposed surgical repair was cosmetic and there was no "medical reason, other than cosmetic, that Mr. Jager needed surgery" at the time of his evaluation.[9]  *Doc. 125-6* at 30:7–15.

In support of their position, Defendants direct the Court's attention to an unpublished Tenth Circuit case with similar facts.  In *Hartz v. Sale*, 687 F. App'x 783, 786 (10th Cir. 2017) (unpublished), the court upheld a grant of summary judgment for the defendants where the incarcerated plaintiff suffered facial fractures, but "no medical provider diagnosed Hartz as requiring facial surgery," including, "[n]otably," the surgical specialist who later examined him.  Because the plaintiff's desired treatment was "elective," and because the uncontroverted evidence showed that the defendants had "examined and treated [plaintiff] for his facial injuries," the court found he had failed to establish a triable issue of fact on either the objective or subjective element of his claim.  *Id*. at 785–86.  The opinion of the trial court below makes it clear that, just as in this case, Mr. Hartz's fractures had already healed by the time of his appointment with the specialist.[10]  *Hartz v. Sale*, 2016 2016 WL 4943970, at *10 (D. Kan. Sept. 16, 2016). The lower court described the otolaryngologist's specific findings as follows:

[9] Standing alone, Dr. Shama's testimony would not be dispositive of the Eighth Amendment question, as it does not establish the status of Plaintiff's surgical repair on June 24, 2016.  Dr. Shama did not see Plaintiff until several months later, on September 29, 2016.  UMF 15.  However, as explained below, Plaintiff has not come forward with evidence demonstrating the likelihood of a different result on June 24, 2016.  In the absence of such evidence, Dr. Shama's testimony lends credence to the individual Defendants' testimony that reconstructive surgery was not medically necessary as of June 24, 2016.
[10] The appellate court also noted that, although an emergency room doctor recommended a follow-up appointment with an otolaryngologist on the day of Mr. Hartz's injury, no consultation was scheduled

> The otolaryngologist determined that plaintiff's issues were resolved. The otolaryngologist observed that plaintiff's face was asymmetric, but that this posed no functional consequences. The otolaryngologist stated that the only purpose for surgery was restoring facial symmetry and thus it was elective surgery.

*Id*. at *6.

Although *Hartz* is not binding precedent, this Court finds it instructive. In this case, as in *Hartz*, "the specialist who examined [Plaintiff] opined that surgery was not medically necessary." 687 F. App'x at 786; *see doc. 125-6* at 30:7–15. The Tenth Circuit there held that prison medical providers were not constitutionally obligated to offer surgery to repair Mr. Hartz's cosmetic defects. In addition, neither the lower court nor the appellate court found that the delay in obtaining a specialist referral until the plaintiff's fractures had already healed constituted deliberate indifference.

Plaintiff relies in part on *Ayala v. San Nicolas*, 2007 WL 135608 (D. Colo. Jan. 16, 2007), to refute Defendants' argument that the Eighth Amendment does not require provision of surgery, timely or otherwise, for cosmetic reasons. *See doc. 133* at 3. In *Ayala*, the court found on a motion to dismiss that the plaintiff had stated a claim for deliberate indifference where a three- to four-month delay in providing surgery resulted in the plaintiff's facial fractures healing incorrectly, "thus requiring rebreaking and cutting of the facial bones and significant pain in the interval." 2007 WL 135608, at

---

until at least a month later, after the plaintiff specifically requested it. *Hartz v. Sale*, 687 F. App'x at 784–85.

*5.  While factually similar, *Ayala* differs from the case at bar in two important respects.

First, the court was obliged by the posture of the case to credit *all* of the plaintiff's

allegations, including the resulting harms of "extreme physical pain and suffering,

extreme discomfort, occlusion, blurred vision, sinus headaches, persistent hypoesthesia,

loose teeth and other dental problems, disfigurement, and permanent physical injuries."

*Id*.  On a motion for summary judgment, by contrast, the plaintiff must support his

allegations with evidence and is entitled to "every *reasonable* inference" arising from the

facts viewed in the light most favorable to him.  *Sealock*, 218 F.3d at 1207 (emphasis

added).  For reasons further explained below, the Court does not find that Plaintiff is

entitled to an inference that the delay in providing surgery following the June 24, 2016

CT scan caused his pain, vision problems, or other alleged symptoms.  Therefore, the

analysis of the objective element must differ from the court's analysis in *Ayala*.

Secondly, one of the plaintiff's allegations in *Ayala* was that the delay in providing

surgery "required" rebreaking of his bones in order to repair the fractures.  *Ayala*, 2007

WL 135608, at *5.  In this case, the evidence does not show that Plaintiff's surgery was

medically "required," or that Defendants consciously disregarded such a requirement.

Rather, Defendants' position, supported by the record, is that surgery was not

medically required at all.

Unlike the prison officials in *Hartz*, Defendants ultimately offered Plaintiff

reconstructive surgery despite the fact that both they and Dr. Shama considered it an

elective, cosmetic procedure.  UMF 21.  Plaintiff takes issue with the several-month

delay in his treatment.  However, because he has not established the medical necessity

of surgery—at least as of June 24, 2016, when the knowledge of his facial fractures can

first be fairly imputed to Defendants—he cannot show that the several-month delay

was a constitutional violation rather than a "difference of opinion with the medical

staff."  *Hartz*, 687 F. App'x at 786 (quoting *Johnson v. Stephan*, 6 F.3d 681, 692 (10th Cir.

1993)).

Moreover, even assuming *arguendo* that Plaintiff's cosmetic deformity is

sufficiently serious to satisfy the objective element, and even assuming the existence of

unnecessary and improper delay in scheduling a consultation, Plaintiff has failed to

show that this delay resulted in substantial harm.  *See*, *e.g.*, *Oxendine*, 241 F.3d at 1276.

Plaintiff does not dispute that he was offered surgery while still incarcerated.  UMF 21.

The crux of Plaintiff's argument is that because surgical treatment was delayed, his

bones unnecessarily healed in the wrong position, causing deformity and other

complications.   But Plaintiff has provided no competent medical testimony that had a

surgical consultation been scheduled at the time Defendants received the CT scan

results—i.e., more than three weeks following the initial injury—this outcome could

have been avoided.

Defendant Castrejon testified that facial bones would heal in "three, four—six

weeks maximum," *doc. 145-5* at 58:24 – 59:6, and that the normal window of time for

surgical repair was seven to ten days, *id*. at 57:12–22.  Similarly, Dr. Shama testified that

she would ordinarily perform surgery on a fracture like Plaintiff's "within a week" of

the injury.  *Doc. 145-6* at 20.  Plaintiff's expert Dr. Taghizadeh, also a surgical specialist

in repairing this kind of injury, opined that surgery should be performed "within a

week of the fracture," and that the bones would begin to fuse "[a]fter several weeks."

*Doc. 145-4* at 13.  Neither of Plaintiff's expert witnesses offered an opinion that surgical

repair would have been significantly easier or involved fewer complications at three to

four weeks post-injury rather than several months post-injury.  Looking at the record as

a whole, the Court cannot conclude that Plaintiff has met his burden to demonstrate a

substantial harm resulting from this delay,[11] even for the purpose of defeating summary

judgment.

Likewise, although Plaintiff alleges numerous other complications including

visual problems that arose from the delay in treatment, he has offered insufficient proof

of causation with respect to the *delay*.  The question is not whether Plaintiff's facial

injury caused problems with his vision, but whether those problems could have been

avoided with prompt surgery following the CT scan.  Similarly, the question is not

whether Plaintiff's facial injuries caused pain—they undoubtedly did—but whether

---

[11] There is certainly evidence of record to establish that surgery could have been more successful during the first week of treatment, before Plaintiff's bones fused.  However, for the reasons previously explained, the Court finds no evidence of deliberate indifference prior to Plaintiff's first CT scan.  Therefore, Plaintiff's claim of deliberate indifference based on delay must rest on Defendants' conduct subsequent to June 24, 2016.

Defendants' delay in scheduling a surgical consult made that pain worse. This Court has previously addressed at some length the deficiencies in Plaintiff's Rule 26(a) expert reports, and the resulting limitations on the experts' testimony. *See generally doc. 171.* Specifically, Plaintiff's expert witnesses may not go beyond the opinions expressed in their Rule 26(a) reports and subsequent depositions. Neither Dr. Reid nor Dr. Taghizadeh expressed any opinion that surgery performed shortly after June 24, 2016, would have averted any of the symptoms that Plaintiff alleges.[12] Without some demonstration that the delay in medical care resulted in substantial harm,[13] Plaintiff cannot meet his burden on summary judgment. *See Sealock*, 218 F.3d at 1210; *Daniels v. Gilbreath*, 668 F.2d 477, 488 (10th Cir. 1982) (causation a required element in deliberate indifference claims); *Duran v. Curry Cty.*, 2013 WL 12172090, at *9 (D.N.M. July 29, 2013) (unpublished) (finding no deliberate indifference where the plaintiff failed to demonstrate causation).

---

[12] On the specific issue of pain, it is doubtful whether the record shows that Plaintiff's pain would have been avoided or lessened even by surgery performed within a week of his injury. Dr. Taghizadeh stated in his report: "Allowing this fracture to heal in the incorrection [sic] position prolongs recovery and may make the recovery process more painful[.]" *Doc. 145-4* at 13. However, he failed to explain whether it makes the recovery process painful in most cases, or very few; what factors determine whether the recovery process is made more painful; and whether the recovery process was made more painful in Plaintiff's specific case. In addition, when asked during his deposition whether it was his impression that if he had had the surgery earlier, he would have less pain, Plaintiff replied: "I'm not sure. They [the consulting surgeons] didn't really go into detail about that." *Doc. 145-1* at 7, 84:15–19.

[13] Because there is *no* evidence to support an inference of causation with respect to the delay, the Court does not reach the question of whether expert testimony would be required on this point. However, the Court observes that this may be a case in which "the effects of delay [are] so subtle or complex that a lay jury cannot adequately determine the issue of causation without expert assistance." *King v. Patt*, 525 F. App'x 713, 722 (10th Cir. 2013) (unpublished).

In sum, Plaintiff cannot show that Defendants acted with subjective deliberate indifference prior to his June 24, 2016 CT scan, because there is no evidence that they knew of and disregarded the extent of his injuries. Following that date, Plaintiff has not created a question of triable fact as to whether his undesirable outcomes could have been avoided, or whether Defendants consciously disregarded a medical need for prompt surgery. Furthermore, without showing the existence of a constitutional deprivation in this case, Plaintiff certainly cannot demonstrate a custom and policy of violating civil rights. *See*, *e.g.*, *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (quoting 42 U.S.C. § 1983) (§ 1983 liability based on custom or policy may be imposed only where that custom or policy subjects a plaintiff "to the deprivation of [] rights . . . secured by the Constitution"). The Court therefore finds that partial summary judgment must be granted in favor of Defendants. Counts I and II of the TAC are hereby DISMISSED WITH PREJUDICE.

## V.    CONTINUED SUPPLEMENTAL JURISDICTION

Following the dismissal of Counts I and II, no federal claims remain in this case. *See generally doc. 90*. Because federal jurisdiction in this case is based on 28 U.S.C. § 1331 rather than diversity of citizenship,[14] *see doc. 90* at 5, the Court exercises only supplemental jurisdiction over Plaintiff's state-law claims.

---

[14] In a footnote of their brief addressing the jurisdictional question, Defendants noted: "While Plaintiff did not plead facts that would support diversity jurisdiction in his complaint, at least by the time that the operative Third Amended Complaint was filed, he was a resident of Hawaii. No Defendant is a resident

"If federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Bauchman v. West High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)) (internal quotation marks omitted). *See also Hubbard v. Okla. ex. rel. Okla. Dep't of Human Servs.*, 759 F. App'x 693, 713–14 (10th Cir. 2018) (unpublished) ("As a general matter, a court will decline supplemental jurisdiction if the underlying [federal] claims are dismissed before trial.") (quoting Wright & Miller, Federal Practice & Procedure § 3567.3 (3d ed. 2018) (alteration in original)). Nonetheless, the district court in this circumstance has the discretion to retain state law claims pursuant to 28 U.S.C. § 1367. *Henderson v. AMTRAK*, 412 F. App'x 74, 79 (10th Cir. 2011) (unpublished); *Young v. City of Albuquerque*, 77 F. Supp. 3d 1154, 1189 (D.N.M. 2014). The court should consider "the values of judicial economy, convenience, fairness, and comity" in order to decide whether to exercise this discretion. *Henderson*, 412 F. App'x at 79 (quoting *Carnegie-Mellon*, 484 U.S. at 350).

In the parties' supplemental briefing on this jurisdictional issue, Plaintiff has indicated his preference for a state court forum, while Defendants urge the Court to retain jurisdiction. *See docs. 185, 187*. Defendants note that the Court and the parties

---

of Hawaii. Plaintiff is also seeking more than $75,000. Therefore, original jurisdiction could be based in diversity." *Doc. 187* at 3 n.1. However, even if Plaintiff had asserted this basis for diversity jurisdiction in the TAC, subject matter jurisdiction is based on the time of filing, not the time of amendment. *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 570–71 (2004).

"have engaged in protracted litigation, have completed discovery, and have fully briefed multiple motions, including those on state law claims." *Doc. 187* at 3. In addition, they correctly observe that "a trial is scheduled in this Court in the relatively near future." *Id.; see doc. 182* (setting jury trial for May 4, 2020).

The Court is sympathetic to Defendants' concerns about convenience and judicial efficiency, and agrees that more litigation has been conducted in this case than in many of the cited cases. However, the remaining state claims raise a number of issues particular to state law such as the sufficiency of expert testimony in medical malpractice cases. Moreover, the Court notes that, should the state law claims continue in federal court, those substantive claims would be materially restrained by the procedural requirements of the federal rules. *See doc. 171.* After considering the relevant factors, the Court cannot find that the usual presumption in favor of dismissal, which is grounded largely in notions of comity, is overcome. Keeping in mind that the court "usually should" decline to exercise jurisdiction over remaining state claims, *Koch v. Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011), the Court hereby declines to exercise its discretion in retaining supplemental jurisdiction over the state law claims.

The question remains about what is to be done with the state law claims. Plaintiff has requested remand to New Mexico state court. However, remand is not available in this instance because the case was originally filed in federal court. *See, e.g., First Nat'l Bank of Pulaski v. Curry*, 301 F.3d 456, 468 (6th Cir. 2002) ("Thus, while a

district court has the discretion to remand a case removed from state court, it may not remand a case that was never removed from state court[.]"); *Ridgway v. Baker*, 720 F.2d 1409, 1412 (5th Cir. 1983), *abrogated on other grounds*, *Turner v. Rogers*, 564 U.S. 431 (2011) ("While a case improperly removed from a state to a federal court may be remanded, there is no authority to transfer a case from a federal to a state court.") (footnote omitted); *Levin v. Lillien*, 511 F. App'x 149, 150 (3d Cir. 2013) (unpublished) (district court did not err in denying a motion to remand or transfer a case to state court where the case was originally filed in federal court); *Payne v. Merrill Lynch, Pierce, Fenner & Smith*, 75 F. App'x 903, 906 (4th Cir. 2003) ("A case originally filed in federal court cannot be remanded to state court."). Plaintiff has cited no contrary authority.

Therefore, the Court will DENY IN PART Plaintiff's motion to decline supplemental jurisdiction and for remand (*doc. 185*) and DISMISS Plaintiff's state claims WITHOUT PREJUDICE. In so doing, the Court FINDS AS MOOT Defendants' Motion for Partial Summary Judgment to Dismiss Count III (Negligence), Count IV (Medical Negligence), and Count V (Negligent Hiring, Supervision, and Credentialing) of Plaintiff's Third Amended Complaint (*doc. 125*) and Centene Corporation and MHM Services, Inc.'s Motion for Summary Judgment (*doc. 129*).

### VI. CONCLUSION

In accordance with the foregoing, Defendants' Motion for Partial Summary Judgment to Dismiss Count I (Deprivation of Civil Rights) and Count II (Custom and

Practice of Violating Civil Rights) of Plaintiff's Third Amended Complaint (*doc. 126*) is GRANTED. Counts I and II of the Third Amended Complaint are hereby DISMISSED WITH PREJUDICE.

Plaintiff's Motion for the Court to Decline Supplemental Jurisdiction[] and Remand State Claims to State Court (*doc. 185*) is GRANTED IN PART and DENIED IN PART. Counts III, IV, and V of the Third Amended Complaint are hereby DISMISSED WITHOUT PREJUDICE and may be re-filed in state court. *See* 28 U.S.C. § 1367(d); *Jinks v. Richland County, S.C.*, 538 U.S. 456, 464 (2003).

**IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**